This moment, I'd like to request, Your Honor, two minutes for rebuttal. You have to help keep track of your own time. That clock represents the entire time. Thank you, Your Honor. Your Honors, in this case, we have Excuse me. Would you identify yourself, sir? Yes. Raul Montes, public attorney for Mr. Francisco Cruz-Urrutia, Your Honors, versus John Ashcroft, now Attorney General Gonzales. Thank you, Your Honors. Your Honors, in this case, we have an egregious bad faith action by an officer of the INS, now the Department of Homeland Security. He stopped, but he questioned Mr. Cruz based solely on his Hispanic appearance and, we might add, on the fact that he had a Hispanic-sounding name on his name tag. He was a manager of Bruges Bagels, approximately 33 miles north of the San Ysidro Port of Entry, which is at the border between the United States and Mexico. Your Honors, in this case, the officer was required to have, in order to ask him a question, to have reasonable suspicion based on articulate facts that this person was an alien, Your Honor. Well, had to have reasonable suspicion? Yes. In order to do what? Based on articulate facts, Your Honor, to ask the question that he asked. In other words, do you have a Social Security number? Well, that wasn't exactly the question, but what is your Social Security number? And it's our position, Your Honor, that in light of the Privacy Act involving Social Security numbers, that he could not have come to that conclusion, the officer, unless he determined first that this person was without documents. Because obviously that statute says that persons who are either citizens or lawful resident aliens, you have to go through a procedure to ask them for the Social Security number. For instance, that they be disclosing it as voluntary, what it's going to be used for, and what their statutory authority for requesting it is. Let's understand what happened here. Yes, Your Honor. The agent apparently contacted your client and asked him to step outside. Is that right? Yes, Your Honor. And this was while they were conducting an investigation of somebody else named Mark or something like that? That's correct, Your Honor. All right. Your client then went outside with his agent, and there were three other agents, so now your client is confronted by four agents. Is that right? That's correct, Your Honor. They're in a patio shirt by... Your client was not under arrest, not handcuffed or anything like that. That's correct, Your Honor. And they ask a few questions, and then the agent asks your client, what's your Social Security number? After asking him some other questions, then he asks, yes, that's correct, Your Honor. And what is the prohibition under these circumstances of an agent asking your client what his Social Security number is? The prohibition, Your Honor, is the statute itself, is that before you ask somebody what is their Social Security number, the determination had to be made that this person was undocumented, did not have documents. Now, if that determination was based solely on his appearance, Hispanic appearance, and his name tag, which had Paco Cruz on it, a store manager, then that's an egregious violation, Your Honor, of the Fifth Amendment. Can you read us the portion of the Privacy Act that you're relying on? Yes, Your Honor. If I could refer the Court to the Petitioner's Brief, the appendix. It'll be Appendix B, where it states, and it'll be on page, let's see, Your Honor. Page 9. Page, let's see, Appendix B, Your Honor. Let me just, yeah, the first page. Disclosure of Social Security number. And then I've put a star next to it. And it says, any Federal, State, or local government agency which requests an individual to disclose a Social Security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it. And it's conceded that that did not happen in this case. That's correct, Your Honor. So what is the remedy for not following that prescription? Well, Your Honor, we're not bringing a cause of action based on the Privacy Act. Right. We're bringing, we're saying. You're saying that's an egregious violation of your client's rights, and that whatever he said ought to be suppressed. That's correct, Your Honor, because we're saying that a Federal officer is presumed to follow the law. And in this case, unless there's evidence to the contrary. And in this case. Let's say that's suppressed. Where does that get you? Well, the same place that Gonzalez-Rivera versus INS Patterson, Your Honor, and then he would. I'm asking some of these questions so the folks in the audience. Yes. Have some vague idea of what we're all talking about. Then he would continue working at Bruegger's Bagels unless an independent officer shows up at another day to have some coffee and determines, based on reasonable suspicion with articulable facts, that this person is undocumented and then can proceed to ask him the appropriate questions, Your Honor. Even if this was appropriate, you're still trying to terminate the proceedings. And generally it's black letter law that an illegal arrest, even an illegal arrest, does not deprive a court or a tribunal of jurisdiction. So even if you suppress that, I don't see where it gets you. Well, then they don't have evidence to establish that this person, by clear, convincing and unequivocal evidence, is an alien, Your Honor. How are they going to establish that? They didn't just grab him right there on the spot and throw him out of the country. He then went through a whole process and proceeding. Yes. And it was that proceeding that developed the predicate for removing him from the country. And why did they grab him? Because they needed him. They needed him to identify. That's exactly right. But as you well know, an illegal arrest, as I said before, does not deprive a tribunal of jurisdiction to adjudicate a question, a legal question. But the Department of Homeland Security still has to prove its case in that tribunal, Your Honor. That tribunal is not going to try to answer that. But they didn't prove it by admitting that his Social Security number was X. That wasn't the only thing that there was. No, but what they used to prove it was the fruit of the poisonous tree by asking for his Social Security number without having no facts to establish that other than his Hispanic appearance or his Hispanic-sounding name. Our position is, Your Honor, that this Constitution is an egregious violation of the Constitution because I have no problems with officers doing their duty. They have to do their duty. They're obligated to do their duty. But if an officer shows up somewhere and singles out somebody and there's proof to that effect that this person is undocumented because solely and I emphasize solely on the basis that this person is Hispanic, then that's an egregious violation of the Constitution, Your Honor. And that's particularly the reason that the Fourteenth Amendment was incorporated into the Fifth Amendment. Similar to what happened under Brown v. Vorevich education, Your Honor, the case immediately following that case was a case where the school defended its cause saying that, well, we're a federal school and not a state school. And the court was saying, well, no, where the conduct is so egregious, it doesn't make any difference. The concept is still the same, whether it's under the Fourteenth or the Due Process Clause, we're talking about the same thing. It's so egregious that we have to apply it. Well, what you're trying to do, if I understood it, was you were trying to suppress, keep the government from using this form. The I-213. The I-213. The Record of Deportable Alien. The Record of Deportable Alien, which is this piece of paper. That's correct, Your Honor. Is that the only piece of evidence in the whole deportation proceeding that showed that he had entered the country illegally and without documentation? Yes, Your Honor. And if the court would note the date on that, that is May 30th, 2001. He was not served with the notice to appear until September 2001, because at that point, apparently, this person that they were looking for, the suspect, his case had been disposed of and they didn't need him anymore, so they took his employment authorization document and his permission to cross the border. And at that point, they placed him under a removal proceeding. Your Honor, I have to say this. What did the agents promise your client, if anything? Well, he asked them at the time that he was at the patio with them, am I under arrest? And they said, well, no. They didn't say no. They said, well, look, put it this way. If you don't show up to the meeting, then we're going to come and get you. So leading him, obviously, to believe that it was more than a mere questioning session. There were no, in particular, to my mind, the record doesn't reveal any other. I thought I remembered something about a temporary work permit. Oh, yes. Yes, he had these temporary documents. Temporary work permit, he was given on May 30th, Your Honor, and a permission to cross the border back and forth. And those he had from May 30th to September. And that's because they wanted to keep him there so they could use him in the other proceeding? Yes. As a witness. You've more than used your time. Yes. I'll give you a minute if you wish to respond. Okay. Thank you, Your Honor. I'm sorry. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. My name is Alison Drucker. I'm here representing the United States. First, the Privacy Act does not really help the petitioner here. First of all, the Privacy Act applies only to U.S. citizens and lawful permanent residents. That's 5 U.S.C. section 552A, subsection A, subsection 2. And also, as I think Judge Trott touched upon, remedies for violations of the Privacy Act are exclusive. They're civil actions. That's 5 U.S.C. section 552A, subsection G, subsection 1. Well, why would they ask him for a Social Security number when they were sitting out on a patio? He was there with four INS agents. Well, I believe that this, that the record has substantial evidence to indicate that they asked him this in connection. In fact, their whole interest in him was in connection with this investigation of Mark. And if I could just speak to that for a moment. Okay. But why would they ask him what a Social Security number was? Well, perhaps they, since they were thinking that he might be a witness in a criminal case against Mark, perhaps they were thinking. Well, perhaps. Now you're guessing. Well, we know that eventually they discussed with him the possibility of being a witness, and they gave him various. But there isn't anything in the record that explains why they asked, is there? You mean that particular question?  That's correct, Your Honor. So perhaps, perhaps they were just trying to nail him as somebody unlawfully in the United States. Well, I guess I would say that the record could support either inference, and our position would be that the burden of proof here is on the Petitioner, and so that there's substantial evidence to support an alternative interpretation. Well, I think it would be clear to most reasonable people that they asked him that question because they thought perhaps he was here illegally. Do you think that's about what happened? No, I don't, Your Honor. I mean, what other reason is there? Well, if you let me go through the facts in this connection, I think you'll see a pattern of the interest that they had in securing him as a witness. I think that was the basis for their questions. Well, that was the reason that they were talking to him in the patio. That's right. But there's no question about that. But the question that is focusing on here is why did they ask him his Social Security number as part of that question? And there doesn't seem to be any reason for that other than the fact that they had some interest in him. Well, as I say, I'm not sure that that's the only inference that you can draw from this. I don't believe that it is. Is that necessary to your argument? No, I think that there's other parts of our argument as well. Was he promised? About that there was no seizure in the first place. Well, you know, not a seizure. They just brought people with them out there and telling them that his testimony was evidence was very important and what's your Social Security number and you can operate with us and we'll make that cooperation known. I believe one was a letter. Did that happen? Did they make that known? I'm sorry, did they make what known? The cooperation, was that made known? I don't believe that it was. But didn't they make a promise? I don't think that has anything to do with the questioning and the immediate issue here. What's fair and what isn't fair. And I'm just wondering, you know, if they tell this man who's been here and hadn't bothered anybody and he's running a very important enterprise, a bagel shop. And that they're going to do something for him. They're going to write a letter and help him. He says that. I mean, that's his testimony. There's nothing else in the record that supports or cuts against that. But even if they had put something in, I mean, that wouldn't be binding on an immigration judge. Well, we're all part of the government, aren't we? I mean, they're part of the administrative branch of government, executive branch. And so is the, you know, they're all under the Department of Justice. That's true, Your Honor. Can you just go and make those statements and casually walk away from them? That doesn't seem right, does it? Again, I'm not sure that that's really, as I see it, the legal issue that's before the court. As I see it, the legal issue before the court is whether or not the evidence of the I-213 should be suppressed or not. Well, let's follow that on then. The I-213, the encounter that we're talking about, as I read the record, was on May 23. Is that correct? Yes, Your Honor, of 2001. And when was the I-213 form prepared? I understand that was May 30. That's correct, Your Honor. About seven days later. Yes. And tell us the circumstances under which the I-213 was prepared. It was prepared at an INS office. How was it prepared? I believe that Petitioner went into the office, I think at the summons, and was asked various questions, and then this form was filled out. I'm not sure what else you're... That's all I'm asking. So it's not something that was obtained on the day of the encounter. No, Your Honor. It was something that was filled out days later when the Petitioner was requested to come to the office. That's correct. And subsequent to that also, Your Honor, on September 4, 2001, the Petitioner filled out a questionnaire, which is also in the record. Let's see. That's pages 96 to 102 with additional information. And that questionnaire was also in the record? Yes. Yes, Your Honor. All those items, those various items, were all in the administrative record. That's what the government's case was based on, not the statement in the field that he had a Social Security number that was bogus. That's correct, yes. Now, as I alluded to before... Well, why was he asked to fill out that statement? What do you think? He was... They wanted him at first to see if he could help the agents figure out who this chap Mark was. After he had voluntarily admitted... And he did that. After he voluntarily admitted that his Social Security number was bad and, in fact, he was in the country as an illegal alien, those are things that he voluntarily admitted in the conversation on, I'm sorry, the 23rd, May 23rd, on the patio. At that point, the officers asked him to come in for an interview. Now, that was completely proper because under 8 U.S.C. 1357, subsection A, the INS has investigative powers. Was that the day he went in there and identified Mark, found the photos, the book of photographs? Yes. I believe that was the same day. So he was a big, pretty big help to the government, wasn't he? Well, he was of some help to the government. Ultimately, they decided not to use him as a witness, so I... Well, they didn't need him anymore, did they? Well, maybe they had other witnesses, sir. Your Honor, I'm not really sure. He didn't seem to be, you know, crucial to getting the criminal conviction. But he was giving some assistance. Yes. He was given documentation so that he could stay here until the... Right. So they clearly, you know, were considering using him in that capacity, and then they felt that, you know, that wasn't necessary, and they asked to have the documents returned. And then they decided to institute deportation proceedings against him. That's correct, Your Honor. And I don't see anything improper in making that decision. No, they helped him. They told him that he would never be subject to removal proceedings. Yeah, he helped them, and then they dumped him. They had never promised him that he would not be subject to removal proceedings, and, in fact, he was. I mean, that was a decision that was proper and lawful. And he would, in order to hold, I guess, in order to hold the government to any promise, it would have had to have been a promise that they wouldn't do anything to him ever, at least. Is that the law? I'm not sure exactly what you're asking. If you were going to try to hold the government to some promise, there would have had to have been an express promise that he relied on, that they would never do anything against him ever, and there was no such promise. No, they didn't make any promise like that, and there's no evidence that he relied on any promise. You tell us that the Privacy Act applies only to U.S. citizens and legal, lawful, permanent residents. Yes. Do you refer to that in your brief? No, Your Honor. We did not. So where do we find that specifically in the Privacy Act? It's 5 U.S.C. section 552, small a, paren, small a, paren 2. Do you have that in front of you? It's the definition. I actually have it on my table. It's the definition of individual. Okay. Do you have a further question? Because you have more than used your time. We promised the other side that we'd give him an extra minute, so thank you. Thank you, Your Honor. My first question is we've just been told that the Privacy Act, although not referred to in the government's brief at all, which I don't find helpful, doesn't apply to your client, only to U.S. citizens and lawful, permanent residents. And if we look at 552, we'll see that. What's your answer to that? Privacy Act doesn't apply to your client. Section 532, a, paren, a, paren, paren 2, which is a part of the appendix, a of the petitioner's opening brief, the term individual means a citizen of the United States or an alien lawfully admitted for permanent residence. So that's not your client? That's not my client, Your Honor. So the Privacy Act doesn't apply to your client? I mean, is that right? Well, you know, I haven't researched the ---- You inform each individual. I haven't ---- So you define individual as excluding your client. The Privacy Act doesn't apply to your client. I'd agree by the terms of that statute that's correct, Your Honor, but I don't know if that's correct under the 14th Amendment, whether that would be ---- That's part of your job, isn't it, to try to figure that out? Well, we were not suing ---- But we were not suing based on the ---- Well, we would take the position, yes, that it would apply to him, but ---- Well, wait a second. I asked you early on what's the prohibition, and you told me the Privacy Act. Now I hear you conceding the Privacy Act doesn't cover your client. Yes, but the problem with the DHS ---- Do you agree with that? Your client does not cover by the Privacy Act. If you look at the plain meaning of these terms, that may be correct, Your Honor. If you look at the law, it excludes your client. Okay. Yes, but if we look at the 14th Amendment, it may very well apply to my client. But that's not the issue in this case. This is all after the fact. Or you say the statute may be unconstitutional in that limitation. In that limitation. Okay. But I'm saying the DHS officers on that day only determined that this person was on the claim after the fact, before the fact. They're obligated to follow the law both under the Privacy Act and also under the ---- Even though he wasn't covered by it. Because they didn't know that he was, whether or not he was undocumented. So that's the original catch-22. They should have asked him, are you covered by the Privacy Act? No, no, no. Maybe they should have asked him, are you a lawful permanent resident or a citizen of the United States? No, no. Like the Court said, you know, everything has its order. The DHS officer walks in this courtroom and he happens to sit by somebody who's Hispanic and asks him a few questions. You know, that's something. But he walks into this courtroom and he stands in the courtroom and he speaks in Hispanic and he says, that person is Hispanic, he's undocumented, I'm going to go approach him and ask him, you know, what's he supposed to learn? That is egregious, Your Honor. The other question I wanted to refer to, Your Honor, is regarding the questionnaire. The questionnaire refers to a voluntary surrender program by individuals who decide to turn themselves into the INS. Now, for cancellation and removal under 240-A-B-1 in this case, now, only the people that have been here ten years or more, which he did, and who have certain qualifying members in their family, that's either U.S. citizens or lawful residents, can qualify for that. It was obvious to them that this person did not qualify for them. So why are they giving you a bogus document? Okay. We understand your argument. You've done very well. Thank you, Your Honor. And we appreciate both sides in the case indulging in a little bit of showmanship here so that we can explain a little bit better what's going on. Thank you very much. The case just argued is submitted for decision, which means that we will go back and talk about it and decide tentatively how we will rule and we will issue a decision in due course after we have written it up and all agreed to it or filed a dissent with it or whatever we decide to do. So thank you very much, Counsel. And we will hear the next case, which is Alvarez-Mora v. Gonzalez. Mr. Montes, a busy man today.
judges: Schroeder, Pregerson, Trott